IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FRANCISCO AGATON-HERNANDEZ,<br><br>  Petitioner,<br><br> v.<br><br>AMY MILLER, Warden,<br><br>  Respondent. | No. C 14-2461 CRB<br><br>**MEMORANDUM AND ORDER DENYING PETITION FOR HABEAS CORPUS** |

Following a bench trial in California state court, Petitioner Francisco Agaton-Hernandez was convicted of second degree murder on July 21, 2011. Ex. A (dkt. 19-2) at 185. On August 26, 2011, the trial court sentenced Petitioner to fifteen years to life in state prison. Ex. A (dkt. 19-2) at 275-76. Petitioner now petitions for a writ of habeas corpus, arguing that he was deprived of his constitutional right to due process because he received ineffective assistance of counsel. Pet. (dkt. 1) at 3. The state court decisions rejecting Petitioner's claims were neither contrary to clearly established federal law nor based on an unreasonable determination of the facts. See 28 U.S.C. § 2254(d). For the reasons set forth below, the Court hereby DENIES Petitioner's request for federal habeas relief.

## I. BACKGROUND

The California Court of Appeal summarized the facts of the case as follows:

> Victor Cabrera was [Petitioner's] former boss and the coconspirator in the murder. On September 28, 2008, Cabrera strangled to death his girlfriend, Roshni Singh, sometime between midnight and 2:00 a.m. at their home in Marina. [Petitioner] was working at a donut shop in

Seaside at the time, but he joined Cabrera later that morning. [Petitioner] admitted he helped Cabrera cover up the murder by staging a robbery, moving the body, and disposing of evidence. [Petitioner] denied he was involved in planning to kill Singh. He claimed he was unaware of the murder until after Cabrera had killed Singh. However, a witness, Jose Ayuzo, told police that [Petitioner] offered to pay him $30,000 to tie up a woman and batter her. Several hours before Singh was killed, [Petitioner] told Ayuzo to go to a gas station in Monterey to commit the assault, but Ayuzo did not go. Cabrera killed Singh later that night.

**I. Cabrera's Fabricated Coverup Story to Police**

Victor Cabrera worked at the Village Motor Works Gas Station on North Fremont Street in Monterey. On September 28, 2008, the day of the murder, at around 6:30 a.m., Cabrera called 911 from the gas station. When police arrived, they found Cabrera on the floor, with his hands tied behind his back. Candy boxes and other items were scattered on the floor. Cabrera claimed he had been robbed. He said he had struggled to free himself for approximately 45 minutes, until he was able to knock over a phone with his nose and dial 911 with his tongue.

Cabrera told police the following false story: He and Singh had driven to the gas station at about 5:00 a.m. in a red Toyota 4Runner. They were planning to go shopping in Berkeley, but he had left his wallet, jacket, and cell phone charger at the gas station the night before. They went to the gas station to retrieve the items before going to Berkeley. Singh remained in the car while he went into the shop. After he went into the shop, two dark-skinned males entered the shop and robbed him. One had a knife, and the other had a handgun. They took his wallet and cell phone, tied him up, and struck him several times. He did not know what happened to Singh or the 4Runner during the robbery. He noticed that the 4Runner was missing when he was calling 911.

Cabrera gave police permission to search his home in Marina, where they found Singh's wallet and cell phone. Later that day, police found the 4Runner parked at an apartment complex in Monterey. Singh's body was lying face down in the back seat.

Cabrera was the beneficiary of a $600,000 life insurance policy on Singh. A second policy for $360,000 named Singh's son as a beneficiary. Cabrera had planned to take care of Singh's son in the event of her death.

Cabrera disappeared before police could arrest him. At the time of [Petitioner's] trial, Cabrera was still missing.

**II. [Petitioner's] Involvement in the Murder**

Police found [Petitioner] through a search of Cabrera's phone records. The records showed calls to and from a phone belonging to "Martin Cerda," an alias used by [Petitioner]. Cabrera had previously been a manager at a Burger King. He had helped [Petitioner] obtain a job at the Burger King by supplying him with a social security number and the Martin Cerda alias.

[Petitioner] made numerous inconsistent statements in multiple interviews with the police. After lying about many aspects of his

2

involvement in the crime, [Petitioner] eventually admitted to the following: Cabrera had visited him at work at Red's Donuts in Seaside on September 27, 2008, the night before the murder, around 10:00 p.m. to 11:00 p.m. Cabrera wanted [Petitioner] to come to Cabrera's home in Marina, but [Petitioner] said he did not get off work until 4:00 a.m. or 5:00 a.m. They then spoke on the phone shortly after 4:00 a.m., when Cabrera again invited [Petitioner] to his home in Marina. [Petitioner] initially claimed he did not know why Cabrera wanted him to go to Marina. [Petitioner] later said Cabrera wanted him to clean the house.

At around 4:30 a.m., [Petitioner] left Red's Donuts, went home, and changed his clothes. He was due at his second job at Burger King at 6:30 a.m. Nevertheless, he took a taxi from his home to Cabrera's home in Marina at around 5:00 a.m. Police interviewed the taxi driver, who confirmed that he drove [Petitioner] to Marina around that time. The driver noticed that [Petitioner] was wearing plastic gloves. [Petitioner] told the driver to drop him off on a corner several houses away from Cabrera's house. [Petitioner] also told the driver he would need another ride later.

When [Petitioner] got to Cabrera's house, Singh was already dead. [Petitioner] claimed Cabrera did not tell him about the murder until [Petitioner] arrived, and that Cabrera had everything planned. [Petitioner] insisted he would not have gone to Cabrera's house if he had known Cabrera had killed Singh.

[Petitioner] said Cabrera invited him in and asked him to help move the body into the car. Singh's body was on a sofa in the living room. [Petitioner] helped Cabrera move the body to the car. [Petitioner] opened the car door, and Cabrera pushed the body into the car. [Petitioner] also turned over the couch cushions that were underneath the body.

Cabrera and [Petitioner] then took the body to the gas station to stage the robbery. At the gas station, Cabrera gave [Petitioner] a rope. Cabrera told [Petitioner] to tie him up, hit him, and throw around some candy and cigarettes. [Petitioner] tied Cabrera, hit him twice, and threw some candy bars on the floor. [Petitioner] then took Cabrera's cell phone and wallet, and threw them in the rear parking lot.

After staging the robbery, [Petitioner] drove the 4Runner with Singh's body in the back to an apartment complex in Monterey, where he parked the car with the body. He threw the car keys into the bushes, and called the taxi driver to pick him up. Police later located the keys where [Petitioner] said they were.

[Petitioner] said he helped Cabrera because Cabrera had treated him well and had helped him get a social security number and a job. [Petitioner] said Cabrera was planning to buy the gas station, and had promised [Petitioner] a job there. [Petitioner] denied that he asked Cabrera for money, but he said Cabrera had promised to give him money after the crime was completed. Cabrera did not say how much money he would give [Petitioner].

**III. Jose Ayuzo's Involvement**
Police also found Jose Ayuzo after discovering numerous phone calls

> between [Petitioner] and Ayuzo in the days before the murder. When police interviewed Ayuzo, he initially denied any involvement, but he later admitted [Petitioner] had solicited his help. Ayuzo made multiple different statements, mixed up the timing of events, and gave vague answers to specific questions. At trial, the parties stipulated that Ayuzo, if called to testify, would give testimony consistent with the following:
>
> One week before the murder, [Petitioner] offered Ayuzo $30,000 to help him tie up and batter a woman at a tire shop in Monterey. The money belonged to the woman's boyfriend, who was [Petitioner's] friend. After this conversation, however, Ayuzo was arrested for shoplifting and decided not to help [Petitioner] with the crime. But because Ayuzo feared [Petitioner], he kept telling [Petitioner] he would help with the assault.
>
> Ayuzo met with [Petitioner] again several days before the murder. [Petitioner] told Ayuzo to meet him at a tire shop and gas station on North Fremont Street in Monterey at 5:00 p.m. on September 27, 2008. The plan was for the woman to arrive there with her boyfriend, whereupon [Petitioner] and Ayuzo would beat her and tie her up.
>
> On the afternoon of September 27, [Petitioner] saw Ayuzo on the street, and offered him a ride. [Petitioner] told Ayuzo to be at the gas station at 5:00 p.m. Ayuzo later said the time was between 5:00 p.m. and 7:00 p.m. Ayuzo turned off his cell phone during part of the evening, and did not go to the tire shop. Later that evening, he turned his phone on and called [Petitioner], who was angry with Ayuzo. Ayuzo said multiple times that he did not hurt Singh or move her body.
>
> Phone records show [Petitioner] and Ayuzo called each other more than two dozen times between September 17 and September 26, 2008. On September 27, [Petitioner] called Ayuzo more than thirty times. On September 28, [Petitioner] called Ayuzo nine times. After 6:45 p.m. on September 27, all [Petitioner's] calls went to Ayuzo's voice mail. Ayuzo's phone service was canceled on September 28.

People v. Agaton-Hernandez, No. H037855, 2013 WL 3240054, at *1–3 (Cal. Ct. App. June 27, 2013) (footnotes omitted).

On August 11, 2009, the Monterey County District Attorney charged Petitioner with murder (Cal Penal Code § 187(a)), with a special circumstance allegation that the murder was for financial gain (Cal. Penal Code § 190.2 (a)(1)). Ex. A (dkt. 19-1) at 93-95. In addition, the District Attorney charged Petitioner with conspiracy to commit murder (Cal. Penal Code § 182(a)(1)). Id. Petitioner waived his right to a jury trial in exchange for the dismissal of the special circumstance allegation and the capping of any conviction at second degree murder. Ex. A (dkt. 19-2) at 172. After a three day bench trial, on July 21, 2011, the trial court found Petitioner guilty of second degree murder. Id. at 185. On August 26, 2011, the trial court sentenced Petitioner to fifteen years to life in state prison. Id. at 275. The

California Court of Appeal affirmed Petitioner's judgment in an unpublished decision on June 27, 2013. Ex. E (dkt. 20-7).

In conjunction with his appeal, Petitioner filed a petition for a writ of habeas corpus with that court. Ex. G (dkt. 21-2). The Court of Appeal rejected the habeas petition without comment on June 27, 2013, Ex. I (dkt 21-5) at 51, and the California Supreme Court denied review on October 2, 2013. Ex. F (dkt. 21-1).

Having exhausted his potential remedies in state court, Petitioner filed this federal habeas petition on May 28, 2014, alleging ineffective assistance of counsel. Pet. at 5-10.

## II.  STANDARD OF REVIEW

Under the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), this Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C § 2254(a). The writ may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim, "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Id. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13 (2000). "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id.

"[A] federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established law

erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id. at 409. The only definitive source of clearly established federal law under 28 U.S.C. § 2254(d) is in the holdings (as opposed to the dicta) of the Supreme Court as of the time of the state court decision. Id. at 412; Clark v. Murphy, 331 F.3d 1062, 1069 (9th Cir. 2003). While circuit law may be "persuasive authority" for purposes of determining whether a state court decision is an unreasonable application of Supreme Court precedent, only the Supreme Court's holdings are binding on the state courts and only those holdings must be "reasonably" applied. Clark, 331 F.3d at 1069. "It is settled that a federal habeas court may overturn a state court's application of federal law only if it is so erroneous that 'there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents.'" Nevada v. Jackson, 133 S. Ct. 1990, 1992 (2013) (citing Harrington v. Richter, 562 U.S. 86, 101 (2011)).

Finally, a federal court must consider whether any constitutional error at trial "had substantial and injurious effect or influence in determining the jury's verdict," because petitioners "are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.'" Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (citations omitted).

**III. DISCUSSION**

Petitioner argues that he received constitutionally defective representation from trial counsel. Pet. at 5-10. Petitioner identifies four errors allegedly resulting in ineffective assistance of counsel: (1) failure to adequately challenge prosecution witness Jose Ayuzo's testimony; (2) failure to investigate a witness who contradicted Ayuzo's statements; (3) failure to object to the introduction of Victor Cabrera's statements; and (4) cumulative prejudice. Memo. of Law in Support of Pet. for Writ of Habeas Corpus (hereafter "Memo.") (dkt. 2) at 11-25. Because the state court did not unreasonably apply the Strickland standard, Petitioner is not entitled to habeas relief from this Court.

6

To prevail on a Sixth Amendment ineffective assistance claim, a petitioner must satisfy the two-pronged Strickland standard.  First, the petitioner must establish that counsel's performance was deficient—that is, that the attorney made errors so serious that the attorney was not functioning as the "counsel" guaranteed by the Sixth Amendment. Strickland v. Washington, 466 U.S. 668, 697 (1984).  Second, the petitioner must show that the deficient performance resulted in prejudice—that is, that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Id. at 694.  But the question before this Court is not whether counsel's performance was so deficient as to meet the Strickland standard.  That was for the state court to decide.  Rather, AEDPA directs this Court to engage in a more nuanced inquiry: whether the state court's application of the Strickland standard was unreasonable.  See Harrington, 562 U.S. at 101.  This inquiry involves "a deference and latitude [to the state court] that are not in operation when the case involves review under the Strickland standard itself."  Id.  As long as "fairminded jurists could disagree" on the correctness of the state court's decision, a federal habeas court may not grant relief.  Id. (citing Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)).

When reviewing an ineffective assistance claim, a federal habeas court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  Strickland, 466 U.S. at 689.  In evaluating the reasonableness of counsel's actions, a reviewing court must consider the circumstances at the time of counsel's conduct and cannot "second-guess" counsel's decisions or view them under the "fabled twenty-twenty vision of hindsight."  Edwards v. Lamarque, 475 F.3d 1121, 1127 (9th Cir. 2007) (en banc) (internal quotation and citations omitted).

On habeas review, the state court summarily denied Petitioner's habeas petition without providing a reasoned opinion.  Ex. I (dkt. 21-5) at 51.  Where there is no opinion for the state court's ruling, "a habeas court must determine what arguments or theories supported or, as here, could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent

7

with the holding in a prior decision of this Court." Harrington, 562 U.S. at 102. For the following reasons, the state court's conclusion was neither predicated on an unreasonable determination of the facts nor contrary to clearly established federal law. See Edwards 475 F.3d at 1126 (holding that the reasonableness of counsel's assistance is a question of law, whereas whether counsel's actions were "tactical" is a question of fact).

### A. Failure to Challenge Ayuzo's Statements

Petitioner argues that trial counsel violated his Sixth Amendment right to effective assistance of counsel by failing to adequately make the trial court aware of the inconsistencies in Jose Ayuzo's testimony. Memo. at 11-12. His argument has three parts. Id. at 22-24. First, Petitioner argues that trial counsel provided ineffective assistance by failing to request a continuance, and instead stipulated to the introduction of Ayuzo's testimony through a three-page police report. Id. at 11. Second, Petitioner argues that trial counsel provided ineffective assistance by failing to play the entire four-hour video of Ayuzo's interview with police. Id. at 14-18. Third, Petitioner argues that trial counsel provided ineffective assistance by not specifically refuting Ayuzo's testimony during closing arguments. Id. at 19. Petitioner asserts that there was no reasonable tactical purpose for counsel's alleged failure to discredit Ayuzo. Id. at 19-20. Because the state court's application of the Strickland standard is objectively reasonable, Petitioner's claims lack merit.

A difference of opinion as to trial tactics does not constitute denial of effective assistance, see United States v. Mayo, 646 F.2d 369, 375 (9th Cir. 1981), and tactical decisions are not ineffective assistance simply because in retrospect better tactics are known to have been available. See Bashor v. Risley, 730 F.2d 1228, 1241 (9th Cir.), cert. denied, 469 U.S. 838 (1984). "There is a 'strong presumption' that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than 'sheer neglect.'" Harrington, 562 U.S. at 109 (citations omitted). There are no "strict rules" for counsel's conduct "[b]eyond the general requirement of reasonableness." Cullen v. Pinholster, 131 S. Ct. 1388, 1406-07 (2011) ("'No particular set of detailed rules for counsel's conduct can satisfactorily

take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions . . . .'") (quoting Strickland, 466 U.S. at 688-89). Here, Petitioner's claims in connection with Ayuzo's statements lack merit because they amount to quarrels with tactical decisions made by trial counsel.

As to Petitioner's first claim regarding continuing the trial, counsel stated that one of his primary trial objectives was to keep the proceedings in front of Judge Duncan, whom he believed was more sympathetic to the defense than other Monterey County judges. Ex. G. (dkt. 21-3) at 10. Judge Duncan was set to retire shortly after Petitioner's trial, so trial counsel had to make the strategic decision to proceed at the scheduled time or risk having the trial reassigned to a less receptive judge. Id. Counsel's decision makes particular sense when considered in conjunction with trial counsel's other stated tactic of minimizing Ayuzo's presence in the trial, and instead emphasizing Petitioner's version of events. Id. at 10-11. Trial counsel stated in his declaration that he thought "the less the trial court heard from Mr. Ayuzo the better." Id. at 10. Once the prosecutor informed trial counsel that he would be introducing Petitioner's statement, counsel concluded that he had achieved his goal of keeping the trial in front of Judge Duncan while sharing Petitioner's version of events without having to call Petitioner to testify. Id. at 10. In short, trial counsel believed that the advantages of proceeding with the trial in front of Judge Duncan outweighed any disadvantages associated with Ayuzo's unavailability to testify. Because trial counsel's decision appears to be based on a strategic consideration informed by investigation, trial counsel's tactic is reasonable under the circumstances.

As to Petitioner's second claim regarding playing the entire four-hour videotape of Ayuzo's interview, doing so would have contradicted counsel's proffered strategy of minimizing Ayuzo's presence in the courtroom. Id. Highlighting Ayuzo's testimony through the introduction of the entire police interview, as Petitioner suggests, emphasizes Ayuzo's testimony, rather than de-emphasizing it as trial counsel intended. Id. Additionally, to the extent that the four-hour video is hearsay, it would require a stipulation from both parties to be introduced into evidence. Petitioner offers no evidence that the prosecutor

9

1 would have agreed to the introduction of the entire video, nor an explanation as to how trial
2 counsel could have unilaterally introduced the video.

3 Further, the trial court was likely aware of inconsistences in Ayuzo's statement. The
4 police report stated that Ayuzo "told multiple different statements and would often describe
5 incidents together that occurred on different days, or be vague when asked specific
6 questions." Ex. A (dkt. 19-3) at 285. While introducing the police report into evidence, the
7 prosecutor admitted that not everything contained within the report was the "honest truth."
8 Ex. B (dkt. 19-7) at 6. The trial court therefore was likely already aware of Ayuzo's dubious
9 credibility.

10 As to Petitioner's third claim regarding trial counsel's failure to mention Ayuzo
11 during closing arguments, Memo. at 19, deference to counsel's tactical decisions in closing
12 presentation is particularly important because of the broad range of legitimate defense
13 strategy at the time, see Yarborough v. Gentry, 540 U.S. 1, 5-6 (2003) (per curiam)
14 (counsel's exclusion of some issues in closing did not amount to professional error of
15 constitutional magnitude where issues omitted were not so clearly more persuasive than those
16 raised). While the trial court did acknowledge that Petitioner might have had a stronger case
17 without Ayuzo's testimony, Ex. B (dkt. 20) at 55, when explaining the verdict, the trial court
18 went on to say that the circumstantial evidence "was overwhelming when you take all these
19 small bits of evidence and put them together." Id. at 57. Such circumstantial evidence
20 includes the substantial number of unanswered calls from Petitioner to Ayuzo, Ex. B (dkt.
21 20) at 18-20, and the testimony from the cab driver who mentioned that he dropped Petitioner
22 off near Cabrera's home at 5:00 am, and picked him up near where the victim's body was
23 found several hours later. Ex. B (dkt. 19-7) at 71-76. When picked up, Petitioner was
24 carrying a woman's purse and several items of clothing. Id. at 70-83. Petitioner then asked
25 the taxi driver to make multiple stops until he found a suitable location, without other people
26 around, to dispose of the clothing. Id. These "small bits of evidence" created a picture of
27 culpability difficult to refute.
28

The state court's denial of Petitioner's habeas petition was not unreasonable because the Strickland standard requires a showing of both incompetence and prejudice; if either one of the elements is not present, relief is unavailable. See Brodit v. Cambra, 350 F.3d 985, 992 (9th Cir. 2003) (state court reasonably concluded that trial attorney provided effective assistance of counsel where attorney declined to present evidence favorable to defense out of concern that it would open door to unfavorable evidence). Trial counsel's handling of Ayuzo's testimony created neither error nor prejudice. Given that the state court decision did not unreasonably apply federal law, Petitioner is not entitled to habeas relief on this theory.

### B.     Failure to Investigate Clemente Cruz-Sumano

Petitioner also contends that counsel provided ineffective assistance by failing to investigate Clemente Cruz-Sumano, who revealed inconsistencies in Ayuzo's statements to police. Pet. at 7. On habeas review, the state court denied this claim. Ex. I (dkt 21-5) at 51. Because this determination was not objectively unreasonable, Petitioner is not entitled to relief.

A defense attorney has a duty to either make reasonable investigations or a reasonable decision that investigation is unnecessary. See Strickland, 466 U.S. at 691; Hinton v. Alabama, 134 S.Ct. 1081, 1088 (2014) (per curiam). But the duty to investigate and prepare a defense does not require interviewing every possible witness. Hendricks v. Calderon, 70 F.3d 1032, 1040 (9th Cir. 1995). Strickland directs that "'a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.'" Silva v. Woodford, 279 F.3d 825, 836 (9th Cir. 2002) (quoting Strickland, 466 U.S. at 491)

Here, Petitioner argues that trial counsel failed to conduct an investigation into statements made by Cruz-Sumano, thus depriving him of his Sixth Amendment right to effective counsel. Pet. at 7. During his police interview, Cruz-Sumano reported that around the time of the murder, Ayuzo mentioned that he was going to be paid a large amount of money for a drug deal. Ex. G (dkt. 21-3) at 17-19. Petitioner alleges that trial counsel provided ineffective representation because Cruz-Sumano's statements contradicted a key

11

component of Ayuzo's testimony: that Petitioner offered Ayuzo money to assist in staging a robbery and battering a woman. Trav. at 12. In response, trial counsel explained that he did not interview Cruz-Sumano because "impeaching Mr. Ayuzo's testimony was not the focus of my trial strategy." Ex. G (dkt. 21-3) at 10. Because counsel's tactical decisions are only entitled to deference if based on reasonable investigation, Petitioner argues that the state court erred in denying his petition. Memo. at 26-27. Having failed to investigate the credibility of Cruz-Sumano or the value of his potential testimony, it is difficult to conclude that counsel's decision was reasonable.

Yet even if trial counsel's decision not to investigate Cruz-Sumano constituted deficient performance, Petitioner is unable to show with reasonable probability that the failure to investigate Cruz-Sumano created prejudice. See Strickland, 466 U.S. at 688. "'To determine whether counsel's failure to investigate prejudiced the outcome of the trial, [the Court] must compare the evidence that was actually presented to the jury with that which would have been presented had counsel acted appropriately.'" See Thomas, 678 F.3d at 1102 (citing Karis v. Calderon, 283 F.3d 1117, 1133 (9th Cir. 2002)).

Even with additional evidence to impeach Ayuzo's credibility, it is unlikely that the trial court would have disregarded the remaining evidence that supported Petitioner's murder conviction based on a conspiracy theory. Significant evidence indicated that Petitioner was aware of the plan to kill Singh prior to arriving at Cabrera's home. Memo P&A in Support of Answer at 22. At around 4:30 a.m. on the night of the murder, Petitioner, clad in plastic gloves, called a taxi and asked to be dropped off a few houses away from Cabrera's home. Ex. B (dkt. 19-7) at 71-74. Prior to being dropped off, Petitioner asked to be picked up several hours later near the exact spot where the victim's body was found. Id. at 75. Petitioner had also previously mentioned to his supervisor that he would be late for his shift at Burger King the morning of the murder. Id. at 21.

In addition, even if counsel had called Cruz-Sumano to testify, his statements could have harmed Petitioner, as they are not altogether inconsistent with the prosecutor's theory of Petitioner's involvement in the murder. With the exception of the solicited transgression,

1  Cruz-Sumano's police interview confirmed that Petitioner had visited Ayuzo and offered him
2  a large amount of money to participate in a crime around the time of murder.  Ayuzo's
3  fabrication regarding the potential offense could be explained as Ayuzo's having believed
4  that delivering drugs for money was a more socially acceptable crime to admit to than tying
5  up and battering a woman.

6  While it is possible that the trial court would have reached a different outcome with
7  the inclusion of Cruz-Sumano, it cannot be said with "reasonable probability" that counsel's
8  failure to investigate Cruz-Sumano's testimony would have led to materially exculpatory
9  information.  See Strickland 466 U.S. at 694.  Given the other evidence and the problems
10 with Cruz-Sumano's statements, it is reasonable to conclude that Petitioner received a fair
11 trial in the absence of Cruz-Sumano's testimony.  See Strickler v. Greene, 527 U.S. 263, 289
12 (1999) (quoting Kyles v. Whitley, 514 U.S. 419, 434 (1995)) ("The question is not whether
13 the defendant would more likely than not have received a different verdict with the evidence,
14 but whether in its absence he received a fair trial, understood as a trial resulting in a verdict
15 worthy of confidence.").  This Court does not agree that counsel's failure to investigate
16 should lead to habeas relief.

### C. Failure to Object to Coconspirator's Statements

18 Petitioner further contends that his attorney rendered ineffective assistance by failing
19 to object to the introduction of Victor Cabrera's statements to police.  Because Cabrera's
20 statements were not testimonial or admitted for the truth of the matter asserted, trial counsel's
21 failure to object to the introduction of Cabrera's statements does not constitute ineffective
22 assistance.

23 The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal
24 prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against
25 him."  U.S. Const. amend. VI.  This right applies to all "testimonial" statements, whether
26 sworn or unsworn, and to both in-court testimony and out-of-court statements introduced at
27 trial.  Crawford v. Washington, 541 U.S. 36, 51-52 (2004).  But "[t]he Clause does not bar
28 the use of testimonial statements for purposes other than establishing the truth of the matter

13

asserted." Id. at 59 n.9.  Only testimonial statements offered for the purpose of establishing the truth of the matter asserted are inadmissible, unless the declarant is unavailable and the defendant had a prior opportunity for cross-examination.  Id. at 68.

Here, Officer Jeff Gibson interviewed Cabrera at the scene of the fake robbery, Ex. B (dkt. 19-7) at 10-13, and Officer Amy Carrizosa interviewed Cabrera later the same day at the police station, id. at 25-26.  In both police interviews, Cabrera shared a largely fabricated story regarding the staged incident.  Id. at 9-13, 26-38.  In neither interview did Cabrera mention Petitioner by name or describe the illegal conduct.  Instead, Cabrera recounted a false tale of arriving at the location of the alleged crime and, shortly thereafter, being assaulted by two men.  Id. at 10, 35-38.  In contrast to Cabrera's version of events, at trial, both parties stipulated that Cabrera strangled the victim between midnight and 2 a.m., id. at 39, prior to when Cabrera claimed that he and Singh arrived at the scene of the alleged robbery.  Id. at 34.  Neither party disputes that Cabrera's statements regarding the fake robbery-murder were false.

Shortly after Cabrera's second interview with police, he disappeared.  Ex. B (dkt. 19-7) at 48-49.  Accordingly, Cabrera's statements to police regarding the fake robbery were introduced at trial through the testimony of Officer Gibson and Officer Carrizosa.  Trial counsel objected to the introduction of Officer Gibson's testimony on hearsay grounds but was overruled under the exception for statements made in furtherance of a conspiracy.  Id. at 9-10.  Trial counsel did not object to the introduction of Officer Carrizosa's testimony and later stated that he did not believe that keeping Cabrera's statements out of evidence would do much good.  Ex. G (dkt. 21-3) at 11.

Petitioner now argues that Officer Carrizosa's testimony regarding Cabrera's interview with police constitutes testimonial hearsay and should have been objected to by trial counsel.  Memo. at 29-30.  Petitioner is incorrect.  While statements to police are traditionally considered testimonial hearsay, see Crawford, 541 U.S. at 53, importantly, none of Cabrera's statements were admitted for the purpose of establishing the truth of the matter asserted, see Moses v. Payne, 555 F.3d 742, 761 (9th Cir. 2009) (finding state court properly

14

1  admitted son's out-of-court statement to social worker that his father had kicked his mother;
2  statement was introduced to show why social worker contacted Child Protective Services, not
3  to prove that defendant had kicked the victim). The prosecution was not offering Cabrera's
4  statements as evidence that the robbery was real. Rather, Cabrera's police interview merely
5  provided context for the fake murder-robbery conspiracy. While Petitioner argues that
6  Cabrera's statements prejudiced him by further corroborating portions of Ayuzo's testimony,
7  in light of the other circumstantial evidence which supported Petitioner's conviction such as
8  testimony from the taxi driver and several late-night meetings with Cabrera in the weeks
9  leading up to the murder, Ex. B (dkt. 19-7) at 14-20, the state court's rejection of this claim
10 was not objectively unreasonable,[1] see Williams v. Taylor, 529 U.S. 362, 409 (2000).

Because Petitioner cannot establish that the state court unreasonably applied the Strickland standard on any of the alleged errors, the petition for habeas corpus as to his ineffective assistance of counsel claims is denied.

### D. Cumulative Prejudice

Petitioner's final argument is that cumulative prejudice requires reversal of the state court's decision. Memo. at 33. Petitioner's claim is without merit.

The Ninth Circuit has held that, in exceptional cases, while no single trial error is sufficiently prejudicial to warrant reversal, the cumulative effect of several trial errors might prejudice a defendant so much that his conviction must be overturned. See Alcala v. Woodford, 334 F.3d 862, 893-95 (9th Cir. 2003). This is not such an exceptional case.

Cumulative error violates due process principles and warrants habeas relief only "where the errors have 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Parle v. Runnels, 505 F.3d 922, 927 (9th Cir. 2007) (citing Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974)). Furthermore, cumulative error applies only where no single error is sufficiently prejudicial but the effect of multiple

---

[1] Petitioner further contends that Cabrera's statement to Officer Carrizosa was inadmissible under the coconspirator hearsay exception because at the point it was taken, the object of the conspiracy, specifically the fake murder-robbery, was complete. Trav. at 15. Because Cabrera's statements were admissible on the ground that they were not being asserted for their truth, this Court need not address Petitioner's argument.

15

errors compound the impact.  See Alcala, 334 F.3d at 893-95.  Where, as here, "there is no single constitutional error . . ., there is nothing to accumulate to a level of constitutional violation."  Mancuso v. Olivarez, 292 F.3d 939, 957 (9th Cir. 2002); see Hayes v. Ayers, 632 F.3d 500, 525 (9th Cir. 2011) (holding that where no error reaches constitutional magnitude on habeas review, no cumulative error is possible).  Petitioner's claim that cumulative error requires reversal of his conviction is without merit.

## IV.  CONCLUSION

The state court's conclusion that Petitioner's trial counsel was not ineffective is not contrary to clearly established Federal law or predicated on an unreasonable determination of the facts.  Accordingly, the petition for a writ of habeas corpus is DENIED.

**IT IS SO ORDERED.**

Dated: June 19, 2015

CHARLES  R. BREYER
UNITED STATES DISTRICT JUDGE